IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA EX REL. LATASHA RICHARDS, | ) ) ) | |
| *and* | ) ) | Civil Action No. 2:11-cv-1539 |
| LATASHA RICHARDS | ) ) | Judge Mark R. Hornak |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| R&T INVESTMENTS LLC, | ) ) | |
| Defendant. | ) ) | |

## OPINION

**Mark R. Hornak, United States District Judge**

This case is a *qui tam* action brought by Relator-Plaintiff Ms. Latasha Richards, on behalf of the United States Government, against her former residential landlord, Defendant R&T Investments, LLC, under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, *as amended.* Plaintiff alleges that Defendant violated the FCA by knowingly submitting false claims to the federal government for rental subsidy payments under the Section 8 Low-Income Housing Choice Voucher Program.

Pending before the Court is Defendant's Motion to Dismiss for Failure to State a Claim, ECF No. 39. The Court has considered Plaintiff's First Amended Complaint ("Amended Complaint"), ECF No. 32, Defendant's Motion to Dismiss, Defendant's Brief in Support of Motion to Dismiss, ECF No. 40, and Plaintiff's Brief in Opposition to Defendant's Motion to Dismiss, ECF No. 45. The matter is ripe for disposition, and for the reasons that follow, Defendant's Motion to Dismiss is denied.

# I.     BACKGROUND

## a.     Factual Background

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept the factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *See Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). Therefore, for the purpose of the disposition of Defendant's Motion, the essential facts are as follows.

In the spring of 2010, Plaintiff, a low-income single mother of three minor children, sought housing for her family via the Section 8 program administered by the Housing Authority of the City of Pittsburgh ("HACP"). Pl.'s Am. Compl. ¶ 36. She located a suitable four bedroom residence at 305 Anthony Street, Mount Oliver, Pennsylvania, 15210 ("the premises"), for lease by its owner, Defendant R&T Investments, LLC, in consideration of $850.00 in monthly rent. *Id.* at ¶ 37. On April 21, 2010, Plaintiff and Defendant signed a lease for rental of the premises, effective June 1, 2010. *Id.* at ¶ 38. Plaintiff signed the lease because she had to vacate her then-current premises by June 1, 2010, wanted to protect the availability of her prospective residence, and anticipated that Defendant's premises would be approved by the Section 8 program before June 1, 2010. *Id.*

On or about April 23, 2010, Plaintiff and Defendant submitted to the HACP a Request for Tenancy Approval ("RFTA") of the premises under the Section 8 program. *Id.* at ¶ 39. Because the new residence was located within the jurisdiction of the Allegheny County Housing Authority ("ACHA") rather than the HACP, the HACP had to transfer Plaintiff's Section 8 voucher and the RFTA to the ACHA for administration. *Id.* at ¶ 40. On or about May 19, 2010, the ACHA received from the HACP the parties' RFTA. *Id.* at ¶ 41. Although the parties' lease

initially required $850.00 in monthly rent, the RFTA submitted by the parties indicated that Defendant would agree to accept $776.00 in monthly rent. *Id.* at ¶ 42. However, the ACHA determined that $732.00 in monthly rent was the appropriate "Rent to Owner."[1] *Id.* In its RFTA, Defendant also agreed to pay for the costs of water and sewage service at the premises. *Id.* at ¶ 43. Due to the delay in accomplishing the transfer of Plaintiff's voucher from the HACP to the ACHA, the ACHA was unable to conduct the mandatory inspection of the premises to ensure compliance with housing quality standards ("HQS") before June 1, 2010, and therefore the ACHA was unable to approve the subject property for Section 8 benefits before June 1, 2010. *Id.* at ¶ 45.

Although Section 8 approval had not yet been granted, Plaintiff and her family moved into the premises on June 1, 2010 because Plaintiff's former residence was no longer available. *Id.* at ¶ 46. As a result, while waiting for ACHA approval of the RFTA, Plaintiff paid Defendant the full $732.00 monthly rent for June 2010. *Id.* After Plaintiff moved into the premises, she discovered that the residence lacked water and sewage service. *Id.* at ¶ 47. Defendant instructed Plaintiff to open the service accounts for those utilities in her name, and she did so. *Id.* Although Defendant promised to reimburse Plaintiff for all expenses associated with those utilities services, Defendant never did so. *Id*

The ACHA conducted the HQS inspection of the premises, and on August 3, 2010, Defendant and the ACHA executed a HAP Contract. *Id.* at ¶ 49. This HAP Contract, retroactive to July 1, 2010 and with an initial term ending on June 30, 2011, set forth that the total Rent to Owner was $732.00 per month. *Id.* The HAP Contract also provided that Defendant was

---

[1] The "Rent to Owner" is "[t]he total monthly rent payable to the owner under the lease for the unit. Rent to owner covers payment for any housing services, maintenance and utilities that the owner is required to provide and pay for." 24 C.F.R. § 982.4.

required to pay any water and sewage costs associated with the premises. *Id.*; *see also* HAP Contract, ECF No. 32-1, at 11. Pursuant to the HAP Contract, the ACHA remitted to Defendant housing assistance rent subsidy payments in the amount of $589.00 per month for July and August of 2010. Pl.'s Am. Compl. ¶ 51. For those same months, Plaintiff remitted to Defendant her tenant portion of $143.00 per month. *Id.*

In early September of 2010, Plaintiff received her first water and sewage service bill, and, in accordance with Defendant's agreement in the HAP Contract, requested that Defendant tender to her the money necessary to pay the bill. *Id.* at ¶ 52. Defendant refused, insisting that the water bill was Plaintiff's responsibility, and asserting that the pre-HAP Contract, April 21, 2010, $850.00/month lease prevailed. *Id.* at ¶ 53. When Plaintiff indicated that she would have to move out because she could not afford to pay the water bill, Defendant threatened to evict her for failing to pay additional rent payments to total $850.00 per month, as the April 21, 2010 lease provided, as opposed to the Rent to Owner of $732.00 that Defendant subsequently agreed to in the HAP Contract. *Id.* at ¶ 54.

Plaintiff, afraid of eviction if she did not pay the additional $118.00 in monthly rent (the difference, which Defendant allegedly started to demand, between the $850.00 per-month rent in the April 2010 lease and the $732.00 per-month rent in the HAP Contract), remitted to Defendant, for the 11 months from September 2010 through July 2011, rent payments in the amount of $261.00 per month ($118.00 plus $143.00), rather than $143.00 per month as prescribed by the Section 8 program and the HAP Contract between the ACHA and Defendant. *Id.* at ¶ 56. For each of those months, the ACHA remitted to Defendant housing assistance rent subsidy payments in the amount of $589.00 per month. *Id.* at ¶ 57.

Part B of Defendant's HAP Contract provides, in pertinent part:

4

¶5    Provision and Payment for Utilities and Appliances

> c. Part A of the HAP contract specifies what utilities and appliances are to be provided or paid by the owner or the tenant. The lease shall be consistent with the HAP contract.

¶ 6    Rent to Owner: Reasonable Rent

> a. During the HAP contract term, the rent to owner may at no time exceed the reasonable rent for the contract unit as most recently determined or redetermined by the PHA in accordance with HUD requirements.

¶ 7    PHA Payment to Owner

> b. Owner compliance with HAP contract. Unless the owner has complied with all provisions of the HAP contract, the owner does not have a right to receive housing assistance payments under the HAP contract.

¶ 8    Owner Certification

> During the term of this contract, the owner certifies that

> b. The contract unit is leased to the tenant. The lease includes the tenancy addendum (Part C of the HAP contract), and is in accordance with the HAP contract and program requirements. The owner has provided the lease to the PHA, including any revisions of the lease.

> d. Except for the rent to owner, the owner has not received and will not receive any payments or other consideration (from the family, the PHA, HUD, or any other public or private source) for rental of the contract unit during the HAP contract term.

Pl.'s Am. Compl. ¶ 58. Part C of Defendant's HAP Contract (the Tenancy Addendum) sets forth that, "[t]he owner certifies that the terms of the lease are in accordance with all provisions of the HAP contract and that the lease includes the tenancy addendum." *Id.* at ¶ 59. It also provides:

¶ 2    Lease

> b. The tenant shall have the right to enforce the tenancy addendum against the owner. If there is any conflict between the tenancy addendum and any other provisions of the lease, the language of the tenancy addendum shall control.

¶ 4    Rent to Owner

5

a. The initial rent to owner may not exceed the amount approved by the PHA in accordance with HUD requirements.

b. Changes in the rent to owner shall be determined by the provisions of the lease. However, the owner may not raise the rent during the initial term of the lease.

¶ 5    Family Payment to Owner

e. The owner may not charge or accept, from the family or from any other source of payment for rent of the unit in addition to the rent to owner. Rent to owner includes all housing services, maintenance, utilities and appliances to be provided and paid by the owner in accordance with the lease.

f. The owner must immediately return any excess rent payment to the tenant.

¶ 14   Conflict with Other Provisions of Lease

a. The terms of the tenancy addendum are prescribed by HUD in accordance with Federal law and regulation, as a condition for Federal assistance to the tenant and tenant's family under the Section 8 voucher program.

¶ 15   Changes in Lease or Rent

a. The tenant and the owner may not make any change in the tenancy addendum. However, if the tenant and the owner agree to any other changes in the lease, such changes must be in writing, and the owner must immediately give the PHA a copy of such changes. The lease, including any changes, must be in accordance with the requirements of the tenancy addendum.

b. In the following cases, tenant-based assistance shall not be continued unless the PHA has approved a new tenancy in accordance with program requirements and has executed a new HAP contract with the owner:

> (i) if there are any changes in lease requirements governing tenant or owner responsibilities for utilities or appliances;
> (ii) if there are any changes in lease provisions governing the term of the lease.

d. The owner must notify the PHA of any changes in the amount of the rent to owner at least sixty days before any such changes go into effect, and the amount of the rent to owner following any such agreed change may not exceed the reasonable rent for the unit as most recently

determined or redetermined by the PHA in accordance with HUD requirements.

*Id.* at ¶ 59. As pled, Defendant, without the knowledge or approval of HUD or the ACHA, imposed modifications on the terms of the parties' lease by demanding that Plaintiff pay Defendant $261.00 per month for rent ($143.00 plus $118.00), and become legally obligated to pay for the water and sewage services provided at the premises. *Id.* at ¶ 62.

As a result, from September 1, 2010 through July 2011, Defendant demanded that Plaintiff tender and remit to Defendant rent payments that totaled $1,298.00 in excess of the portion of the rent that Plaintiff was obligated to pay under the HAP Contract and the parties' lease. *Id.* at ¶ 64. During that same time period, Plaintiff incurred charges totaling $2,141.82 for water and sewage services provided to the premises. *Id.* at ¶ 65. Of that total amount, Plaintiff paid $1,625.26 to the water company for those services. *Id.*

As pled, Defendant, as a HAP Contract signatory, knew or should have known that it was not permitted to receive and accept from Plaintiff, HUD, and the ACHA, rent in excess of the Rent to Owner of $732.00 monthly without first notifying the ACHA and obtaining its approval for doing so. *Id.* at ¶ 72. Plaintiff also avers that Defendant knew or should have known that it was not permitted to require Plaintiff to pay the costs of water and sewage service provided to the premises without first notifying the ACHA and obtaining its approval for doing so, and without first executing a new HAP Contract for this purpose. *Id.* at ¶ 74.

In the spring of 2011, as the result of a conversation she had with an ACHA Housing Counselor, Plaintiff became aware that Defendant had wrongfully demanded and accepted from her payments in excess of the Section 8 rent that she was required to pay as a tenant, and that Defendant had wrongfully refused to pay the bills for water and sewage service at the leased

premises. *Id.* at ¶ 76. As a result, in August of 2011, Plaintiff vacated the premises and relocated to another Section 8 leased residence. *Id.* at ¶ 77.

Between September 2010 and July 2011, pursuant to the Section 8 program and the HAP Contract executed between Defendant and the ACHA, HUD (by and through the ACHA), remitted to Defendant 11 separate monthly rent subsidy checks in the amount of $589.00 each. *Id.* at ¶ 78. Defendant endorsed and cashed or deposited each of these housing assistance payment checks into a bank account. *Id.* at ¶ 79. Each of these claims for payment from the ACHA carried with it Defendant's certifications under the HAP Contract and the HUD Tenancy Addendum, including Defendant's HAP Contract certification that Defendant "ha[d] not received . . . any payments or other consideration (from the family, the PHA, HUD or any other public or private source) for rental of the contract unit during the HAP contract term." *Id.* at ¶ 80.

During this same period, Defendant received an economic benefit of $2,141.82 by shifting the burden of payment of the water and sewage bills to Plaintiff and refusing to reimburse Plaintiff for the payments she made for those services. *Id.* at ¶ 82. Plaintiff avers that the ACHA paid on the false claims of Defendant because Defendant certified its compliance with the obligations, terms, and conditions of the Section 8 program. *Id.* at ¶ 83.

In summary, Plaintiff contends that between September 2010 and July 2011, Defendant made 11 separate false claims for federally-funded Section 8 housing assistance payments, and knowingly endorsed and presented for payment a total of $6,479.00 in assistance payments, while demanding and accepting from Plaintiff $1,298.00 in excess of the Rent to Owner under the HAP Contract, and refusing to pay for the water and sewage services provided at Plaintiff's residence, also in contravention of the HAP Contract. *Id.* at ¶¶ 90, 91.

### b.  Procedural Background

This case was originally filed under seal on December 5, 2011, by Plaintiff-Relator Latasha Richards, and remained under seal while the United States evaluated whether or not to intervene in Ms. Richards' *qui tam* action. On June 19, 2013, the United States filed a Notice with the Court that it was declining to intervene. On June 20, 2013, this Court ordered that Ms. Richards' Complaint be unsealed, with all other contents of the Court's file in this action remaining under seal, except for that Notice and all other matters occurring in this action after the date of that Order. On August 22, 2013, Defendant filed its Motion to Dismiss, ECF No. 30, and on September 4, 2013, Plaintiff filed her First Amended Complaint, ECF No. 32. On September 5, 2013, this Court entered an Order denying as moot without prejudice Defendant's Motion to Dismiss. And finally, on September 23, 2013, Defendant filed a Motion to Dismiss Plaintiff's First Amended Complaint, ECF No. 39, and on October 16, 2013, Plaintiff filed her Response in Opposition, ECF No. 44.

## II.  DISCUSSION

### a.  Standard of Review

In considering a Rule 12(b)(6) motion, we must be mindful that federal courts require notice pleading, as opposed to the heightened standard of fact pleading. To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must allege "enough facts to state a claim for relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "The District Court must accept the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at

678. In short, a motion to dismiss should be granted if a party does not allege facts that could, if established at trial, entitle him to relief. *See Fowler*, 578 F.3d at 211.

In deciding this Rule 12(b)(6) motion, the court must consider only the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents if the complainant's claims are based on these documents. *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010); Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

The more rigorous pleading standard in Rule 9(b) of the Federal Rules of Civil Procedure also applies to False Claims Act claims, such as the fraud claims presented in this case. *United States ex. rel. Wilkins v. United Health Group*, 659 F.3d 295, 301 n.9 (3d Cir. 2011) (citing *United States ex. rel. LaCorte v. SmithKline Beecham Clinical Labs*, 149 F.3d 227, 234 (3d Cir. 1998)). Accordingly, "plaintiffs must plead FCA claims with particularity in accordance with Rule 9(b)." *Id.*; Fed. R. Civ. P. 9(b); *Illinois Nat. Ins. Co. v. Wyndham Worldwide Operations, Inc.*, 653 F.3d 225, 232-33 (3d Cir. 2011).

"Rule 9(b) exists to insure adequate notice so that defendants can intelligently respond." *Wyndham Worldwide Operations*, 653 F.3d at 233 (citing *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 414 n. 2 (3d Cir. 2003) ("The purpose of Rule 9(b) is to provide notice, not to test the factual allegations of the claim.")). When a party alleges fraud or mistake, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). As the Supreme Court has explained, the term "generally" is a relative term: "[i]n the context of Rule 9, it is to be compared to the particularity requirement applicable to fraud or mistake." *Iqbal*, 556 U.S. at 686.

Just this past month, our Court of Appeals articulated, for the first time, what Rule 9(b) requires of an FCA claimant at the pleading stage to satisfy the "particularity" requirement of Rule 9(b). *See Foglia v. Renal Ventures Management, LLC*, 2014 WL 2535339, -- F.3d --, at *1-*2 (3d Cir. June 6, 2014). The Court of Appeals, in keeping with the analysis of the First, Fifth, and Ninth Circuits, held that a "more nuanced reading of the heightened pleading requirements of Rule 9(b)" was appropriate, such that "it is sufficient for a plaintiff to allege particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.* at *6 (quoting *United States ex. rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)). The *Foglia* court concluded that "it is hard to reconcile the text of the FCA, which does not require that the exact content of the false claims in question be shown, with the 'representative samples' standard favored by the Fourth, Sixth, Eighth, and Eleventh Circuits." *Id.* at *2.[2] "Insofar as the purpose of Rule 9(b) is the provide defendants with fair notice of the plaintiffs' claims, the more 'nuanced' approach followed by the First, Fifth, and Eleventh Circuits will suffice." *Id.* (internal citations and quotations omitted).

**b.      The False Claims Act**

The FCA allows private persons, called relators, to bring *qui tam* actions on behalf of the United States against persons or entities who knowingly submit false claims to the federal government. 31 U.S.C. § 3730(b)(1). "The primary purpose of the FCA 'is to indemnify the government – through its restitutionary penalty provisions – against losses caused by a defendant's fraud.'" *Wilkins*, 659 F.3d at 304 (internal citations omitted). "Its roots can be traced to the Civil War, when it was enacted in response to contractors who sold faulty weaponry, rancid food and unseaworthy ships to the government." *United States v. Educ. Mgmt.*

---

[2]  As our Court of Appeals explained, "[t]he Fourth, Sixth, Eighth, and Eleventh Circuits have held that a plaintiff must show 'representative samples' of the alleged fraudulent conduct, specifying the time, place, and content of the acts and the identity of the actors." *Foglia*, 2014 WL 2535339, at *2.

*Corp.*, 871 F. Supp. 2d 433, 445 (W.D. Pa. 2012) (internal citation omitted). Under the FCA, the United States has a right to intervene and assume primary responsibility for prosecuting the action, § 3730(c)(1), and if the United States declines to intervene, the relator may pursue the action on the United States' behalf, § 3730(b)(4). Either way, the relator is eligible to collect a portion of any damages awarded. § 3730(d).

Title 31 U.S.C. § 3729(a)(1)(A) provides that "any person who – (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval . . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1)(A). Section 3729(a)(1)(B) provides that "any person who – (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" is liable under that same penalty. The FCA defines the term "knowingly" as follows:

> (A) [] that a person, with respect to information - -
> (i) has actual knowledge of the information;
> (ii) acts in deliberate ignorance of the truth or falsity of the information; or
> (iii) acts in reckless disregard of the truth or falsity of the information; and
> (B) [r]equires no proof of specific intent to defraud[.]

Section 3729(b)(1). The statute defines the term "claim," in pertinent part, as "any request or demand . . . for money or property . . . that – is presented to an officer, employee, or agent of the United States." § 3729(b)(2).

To establish a *prima facie* FCA violation under § 3729(a)(1), a plaintiff must prove that "(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent." *Wilkins*, 659 F.3d at 304-05 (citing *U.S. ex. rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 242 (3d Cir. 2004)).

False claims under the FCA fall into two categories: a factually false claim and a legally false claim. *Id.* at 305 (citing *U.S. ex. rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1217 (10th Cir. 2008)). "A claim is factually false when the claimant misrepresents what goods or services that it provided to the Government." *Id.* A "claim is legally false when the claimant knowingly falsely certifies that it has complied with a statute or regulation the compliance with which is a condition for Government payment." *Id.*

"A legally false FCA claim is based on a 'false certification' theory of liability," and there are two types of false certifications: express and implied. *Id.* (citing *Conner*, 543 F.3d at 1217).[3] "Under the 'express false certification' theory, an entity is liable under the FCA for falsely certifying that it is in compliance with regulations which are prerequisites to Government payment in connection with the claim for payment of federal funds." *Id.* (internal citation omitted).

"Implied false certification" liability is a more expansive version of the express false certification theory, and "attaches when a claimant seeks and makes a claim for payment from the Government without disclosing that it violated regulations that affected its eligibility for payment." *Id.* As such, "an implied false certification theory of liability is premised 'on the notion that the act of submitting a claim for reimbursement itself implies compliance with governing federal rules that are a precondition to payment." *Id.* (citing *Mikes v. Straus*, 274 F.3d 687, 699 (2d Cir. 2001); *United States v. Sci Applications Int'l Corp.*, 626 F.3d 1257, 1266 (D.C. Cir. 2010) ("Courts infer implied certifications from silence where certification was a prerequisite to the government action sought.")). Ultimately, the FCA was intended to reach all types of fraud, without qualification, that might result in financial loss to the Government.

---

[3] In *Wilkins*, the Third Circuit first "join[ed]" with these many courts of appeals in holding that a plaintiff may bring an FCA suit under an implied false certification theory of liability." *Wilkins*, 659 F.3d at 306.

13

*Wilkins*, 659 F.3d at 306 (quoting *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968));

*see also id.* at 306 (recognizing that an implied false certification theory "is consistent with Congress' stated intent inasmuch as under the implied false certification theory of liability, even in the absence of a false certification of compliance, the Government or *qui tam* plaintiffs successfully may bring an action that holds a claimant liable for submitting legally false claims to the Government").

      **c.**     **The Section 8 Low-Income Housing Choice Voucher Program**

     In 1937, the United States Housing Act, 42 U.S.C. § 1437 *et seq.*, was enacted to provide housing by making payments directly to local housing authorities. *See United States v. Southland Management Corp.*, 326 F.3d 669, 671 (5th Cir. 2003). Section 8 was added to the United States Housing Act in 1974 to authorize the making of "assistance payments" to encourage private property owners to provide housing to low-income individuals. *See* 42 U.S.C. § 1437f. The Department of Housing and Urban Development ("HUD") administers the Section 8 program, and promulgated the federal regulations governing the implementation and administration of the program at 24 C.F.R. § 982. In the HUD Housing Choice Voucher Program and the HUD certificate program, HUD pays rental subsidies so that eligible families can afford proper housing. 24 C.F.R. § 982.1. These programs are generally administered by State or local governmental entities called public housing agencies ("PHAs"), with HUD providing housing assistance funds to those PHAs. *Id.* The PHAs then remit these assistance payments ("HAP") on behalf of eligible tenants to the private property owners, in accordance with housing assistance payment contracts entered into between the PHAs and the property owners (and executed on forms directed by HUD). 24 C.F.R. § 982.162. The amount of these assistance payments, made directly to the private property owners in the form of a subsidy, is

determined by what the tenant can afford to pay and what the private property owner could otherwise expect to charge under the prevailing market rates. 42 U.S.C. §§ 1437a(a)(1), 1437f(c). To receive assistance payments, a property owner must enter into the above-mentioned housing assistance payment contract ("HAP Contract"). 42 U.S.C. § 1437f(c); 24 C.F.R. § 811.102 (2002).

### d. Defendant's Motion to Dismiss Counts I and II of Plaintiff's Amended Complaint

Count I of Plaintiff's Amended Complaint alleges that Defendant "knowingly presented or caused to be presented 11 separate false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A)," and Count II alleges that Defendant "knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim, in violation of 31 U.S.C. § 3729(a)(1)(B)." As Defendant states, Plaintiff's Amended Complaint does not seek recovery under a factually false claim theory of recovery, but is loosely premised on both an express certification claim and an implied false certification claim.

Defendant contends that Plaintiff's allegations fail to meet the requirements of an express certification claim, fall short of the requirements of identifying any false claim that was submitted to the United States, and Defendant contends that Plaintiff's Amended Complaint does not reflect a requirement or procedure in which there is any written or express certification submitted by the Defendant to obtain Section 8 subsidy payments. *See* Def.'s Br. in Supp. of Mot. to Dismiss ("Br. in Supp."), ECF No. 40, at 13. Moreover, Defendant asserts that Plaintiff "ha[s] not pled or identified any documents whatsoever that [] Defendant submitted to the ACHA to obtain a payment to establish a claim under 31 U.S.C.A. § 3729(a)(1)(B)," and "[i]n the absence of the identification of a submission of an express certification in order to obtain

section 8 rental payments, any claim premised on 'express certification' theory must fail." *Id.* at 14.

This Court disagrees. In her Amended Complaint, Plaintiff offers sufficient factual averments to put Defendant on fair notice of Plaintiff's FCA claims against it. Plaintiff alleges (1) that Defendant specifically certified during the term of the HAP Contract that Defendant was not receiving additional payments (beyond those to which it was entitled) for rental of the premises, Pl.'s Am. Compl. ¶¶ 21, 80; (2) that Defendant specifically certified that the parties' lease was in accordance with the HAP Contract and Section 8 program requirements, *id.* at ¶ 58; (3) that under the HAP Contract, Defendant specifically requested and received 11 separately-issued federally-funded housing assistance payments for months during which Defendant received rent payments in excess of the amount Defendant was permitted to collect under the HAP Contract, *id.* at ¶ 94; and (4) that Defendant's endorsement of each HAP check during the same time period in which Defendant demanded and received excess rent from Plaintiff constitutes a separate false claim and misrepresentation to the Government that Defendant had not received any other consideration for the rented premises during that month, *id.* at ¶ 101; *see generally* HAP Contract, ECF. No. 32-1.

Contrary to Defendant's contention, Plaintiff's Amended Complaint contains specific examples of certifications set forth in the HAP Contract that make the allegation plausible that Defendant is liable under an express false certification theory "for falsely certifying that it [was] in compliance with regulations which are prerequisites to Government payment in connection with the claim for payment of federal funds." *See Wilkins*, 659 F.3d at 305. With regard to Defendant's assertion that Plaintiff has not identified any documents that Defendant submitted to the ACHA to obtain a payment so as to permit recovery under 31 U.S.C. § 3729(a)(1)(B), our

Court of Appeals made clear in *Foglia*, in rejecting the analysis of the Fourth, Sixth, Eighth, and Eleventh Circuits that a plaintiff must show "representative samples" of the allegedly fraudulent conduct and specify the times, place, and content of the acts and the identity of the actors, that "it is sufficient for a plaintiff to allege particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Foglia*, 2014 WL 2535339, at *2.

The *Foglia* court built its "more nuanced approach" to FCA fraud pleading on its reasoning in *Wilkins*, where our Court of Appeals noted that it had never "held that a plaintiff must identify a specific claim for payment *at the pleadings stage* of the case to state a claim for relief." *Id.* (quoting *Wilkins*, 659 F.3d at 208 (emphasis in original)). As the *Foglia* court observed, requiring "representative samples" at the pleading stage would be "one small step shy of requiring production of actual documentation with the complaint, a level of proof not demanded to win at trial and significantly more than any federal pleading rule contemplates." *Foglia*, 2014 WL 2535339, at *2 (quoting *Grubbs*, 565 F.3d at 190). This Court concludes that at this juncture, Plaintiff has sufficiently and plausibly pled that Defendant is liable under an express false certification theory.

As for recovery under the broader implied false certification theory, Defendant contends that "Plaintiff's Complaint fails to allege that Defendant's compliance with the HAP Contract was a pre-condition for the payment of the rental assistance payment checks by ACHA to Defendant." Br. in Supp. at 15; *see also id.* at 12-14. As our Court of Appeals stated in *Wilkins*, "to plead a claim upon which relief could be granted under a false certification theory, either express or implied, a plaintiff must show that compliance with the regulation which the defendant allegedly violated was a condition of payment from the Government." *Wilkins*, 659

F.3d at 309. As pled in Paragraph 58 of the Amended Complaint, the HAP Contract sets forth in Part B, Paragraph 7.b. that "[u]nless the owner has complied with all provisions of the HAP contract, the owner does not have a right to receive housing assistance payments under the HAP contract." HAP Contract, ECF No. 32-1, at 13; *see also id.* at 20 ("the terms of the tenancy addendum are prescribed by HUD in accordance with Federal law and regulation, as a condition for Federal assistance to the tenant and tenant's family under the Section 8 voucher program").

Specifically with regard to owners' or tenants' responsibilities for payment of utilities, Paragraph 30 of the Amended Complaint alleges that HUD regulations found at 24 C.F.R. § 982.308 govern the content of the leases that owners and Section 8 tenants may execute, and § 982.308 specifically provides that "tenant-based assistance shall not be continued unless the PHA has approved a new tenancy in accordance with program requirements and has executed a new HAP contract with the owner: (i) [i]f there are any changes in lease requirements governing tenant or owner responsibilities for utilities." 24 C.F.R. § 982.308. Plaintiff has sufficiently pled that Defendant "ma[de] a claim for payment from the Government without disclosing that it violated regulations that affected its eligibility for payment," *see Wilkins*, 659 F.3d at 306, and that "compliance with the regulation which the defendant allegedly violated was a condition of payment from the Government," *see id.* at 309. This Court therefore concludes that Plaintiff has also sufficiently pled an FCA violation under an implied false certification theory. It will be incumbent upon Plaintiff to prove Defendant's liability under such theories of recovery, but dismissal is not warranted at this juncture.

Defendant further posits that Plaintiff has insufficiently pled scienter in her Amended Complaint. Federal Rule of Civil Procedure 9(b) provides that scienter may be pled "generally." Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be

alleged generally."). In numerous paragraphs, Plaintiff has alleged that Defendant acted "knowingly," and Plaintiff's Amended Complaint also contains specific examples that make such an allegation plausible. *See Educ. Mgmt. Corp.*, 871 F. Supp. 2d at 453. Plaintiff alleges that, among other things, given the fact that Defendant entered into the HAP Contract and agreed to its above-mentioned provisions, including the $732.00 Rent to Owner and the requirement that Defendant pay water and sewage costs, Defendant knew or should have known that it was not permitted to receive the benefit of excess payments by Plaintiff, Pl.'s Am. Compl. ¶¶ 49, 50, 60, 61, 71, 72; that the HAP Contract (which plainly exhibits Defendant's signature) provides that the owner may not charge or accept from any source any payment for the rent of the unit over and above the agreed-upon Rent to Owner, Pl.'s Am. Compl. ¶ 21; and that the HAP Contract provides that during its term, the owner certifies that, except for the Rent to Owner set forth in the contract, the owner has not received any payments or other consideration for rental of the premises, *id.*; *see also* HAP Contract, ECF No. 32-1.

Construed in the light most favorable to Plaintiff, the allegations in Plaintiff's Amended Complaint are sufficient to make it plausible that Defendant acted knowingly – that Defendant, with respect to the relevant information, "(i) ha[d] actual knowledge of the information; (ii) act[ed] in deliberate ignorance of the truth or falsity of the information; or (iii) act[ed] in reckless disregard of the truth or falsity of the information." *See* 31 U.S.C. § 3729(b)(1).

Finally, Defendant avers that Plaintiff, as Relator, is not entitled to the damages that she requests on her behalf in the Amended Complaint. Title 31 U.S.C. § 3730(d)(1) sets forth the *qui tam* plaintiff's award if the Government proceeds with an action brought by a relator, and § 3730(d)(2) sets forth the *qui tam* plaintiff's award when the Government opts not to proceed with the relator's FCA action. The latter statutory provision provides that

> If the Government does not proceed with an action under this section, the person bringing the action or settling the claim shall receive an amount which the court decides is reasonable for collecting the civil penalty and damages. The amount shall not be less than 25 percent and not more than 30 percent of the proceeds of the action or settlement and shall be paid out of such proceeds. Such person shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant.

31 U.S.C. § 3730(d)(2). Here, Plaintiff requests, specific to her, an award of the "qui tam plaintiff's share of the proceeds or settlement pursuant to 31 U.S.C. § 3730(d)(1) [sic] of at least 25 percent but not more than 30 percent of the proceeds of Ms. Richards' claim or settlement of Ms. Richard's claim as set forth in this Amended Complaint," Pl.'s Am. Compl. ¶ 126(E), and "damages in the amount of $6,479.00," *id.* at ¶ 126(F). Defendant asserts that the FCA does not contemplate awarding a relator-plaintiff the exact amount of damages that the Government has sustained. *See* 31 U.S.C. § 3730(d); 31 U.S.C. § 3729(a)(1)(G). Plaintiff appears to concede this point. Pl.'s Br. in Opp'n, ECF No. 45, at 23. Certainly, as a *qui tam* plaintiff, Ms. Richards is entitled to an award of damages under § 3730(d)(2) – "an amount not [] less than 25 percent and not more than 30 percent of the proceeds of the action or settlement," and "an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs."

Plaintiff cites to *United States ex. rel. Wade v. DBS Investments, LLC*, 2012 WL 3759015 (S.D. Fla. 2010), and *Coleman v. Hernandez*, 490 F. Supp. 2d 278 (D. Conn. 2007), for the proposition that under the FCA, she can recover the "actual damages" that she alone suffered, in addition to her entitled percentage of the Government's recovery under § 3730(d)(2)'s provisions for a *qui tam* plaintiff's award. However, neither *Wade* nor *Coleman* explain whether those courts' awards of the relator-plaintiffs' "actual damages" were encompassed within the relator-plaintiffs' "reasonable expenses" or any other costs that a relator-plaintiff is permitted to recover

20

under § 3730(d)(2). Those decisions do not point to the statutory basis for those awards, and neither Plaintiff's responsive briefs, the Defendant's moving briefs, nor this Court's related research revealed any Third Circuit precedent allowing (or disallowing) a FCA relator-plaintiff to recover damages over and above the relator-plaintiff's percentage of the Government's recovery as provided for in section 3730(d)(2) of the FCA, the purpose of which is to "indemnify the *government* - through its restitutionary penalty provisions - against losses caused by a defendant's fraud." *See Wilkins*, 659 F.3d at 304 (emphasis added). Therefore, at this point, the Court will deny the Motion to Dismiss on those grounds, but without prejudice to further litigation of that issue by the parties based upon their citation to relevant statutory and caselaw authority in support of their respective positions.

### III. CONCLUSION

For the foregoing reasons, this Court concludes that Plaintiff has sufficiently and plausibly pled that Defendant "(1) presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent." *See Wilkins*, 659 F.3d at 304-05. Defendant's Motion to Dismiss Plaintiff's Amended Complaint is therefore denied on the terms set forth in this Opinion. An appropriate Order will follow.

Mark R. Hornak
United States District Judge

Dated: July 3, 2014

cc: All counsel of record